# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| DAVID C. BARRY and VANESSIA B. BARRY, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:16-cv-00167-JEO |
| BIG M TRANSPORTATION, INC., et al., | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

This action, which was filed in Alabama state court and then removed to federal court, arises out of a motor vehicle accident that occurred on Interstate 20 in Cleburne County, Alabama.  Plaintiffs David and Vanessia Barry were injured when a tractor-trailer driven by defendant Joshua Shaffer, an employee of defendant Big M Transportation, Inc. ("Big M"), struck their vehicle, which was stopped in the right lane of traffic along with two other vehicles.  The Barrys seek to recover compensatory and punitive damages for their injuries and have asserted the following claims against Big M and Shaffer (collectively, "Defendants"): a claim against both Defendants for wanton or reckless operation of the tractor-trailer (Count I of the Barrys' complaint); a claim against both Defendants for negligent operation of the tractor-trailer (Count II); a clam against Big M for

wanton or negligent entrustment of the tractor-trailer to Shaffer (Count III); a

"respondeat superior" claim against Big M (Count IV); a negligent training claim

against Big M (Count V); a negligent hiring claim against Big M (Count VI); a

claim against Big M for negligent maintenance or repair of the tractor-trailer

(Count VII); and a claim against Big M for negligent or wanton supervision (Count

XI).[1]  The Defendants have denied the Barrys' claims and have asserted a number

of affirmative defenses, including contributory negligence, assumption of the risk,

and intervening cause.

 The case is now before the Court on four related motions.  Big M and

Shaffer have each filed a motion for summary judgment on the Barrys' claims.

(Docs. 46 & 47).  The Barrys have filed a motion for partial summary judgment on

the Defendants' affirmative defenses of contributory negligence, assumption of the

risk, and intervening cause, and for a "spoliation sanction" in the form of either a

default judgment on the Defendants' negligence liability or an order judicially

establishing certain facts against the Defendants. (Doc. 50).  Shaffer has also filed

a motion to strike Exhibit 16 to the Barrys' motion for partial summary judgment

(doc. 50-16), a sketch he drew of the accident 24 to 48 hours after it occurred.

(Doc. 60).  All of the motions have been briefed and are ripe for decision.

---

[1]In addition to Big M and Shaffer, the Barrys' complaint named their underinsured motorist
insurance carrier, Alfa Insurance Corporation ("Alfa"), and fifteen fictitious parties as
defendants. (Doc. 1 at 16-17).  Alfa has been granted leave to opt out of the litigation. (Doc. 33).
The Barrys never amended the complaint to substitute the names of any of the fictitious parties.

## FACTS

**A.    Big M's Hiring of Shaffer**

Big M is a transportation company that employs commercial truck drivers. (Deposition of Benton Elliott ("Elliott Dep.") at 29).[2]  On March 15, 2015, Big M hired Shaffer as a trainee driver.  (Deposition of Joshua Shaffer ("Shaffer Dep.") at 23).[3]  At that time, Shaffer had a valid commercial driver's license ("CDL"), but his only prior commercial driving experience was approximately 20 to 30 days as a trainee driver for Covenant Transport in 2012. (Shaffer Dep. at 18-21; Elliott Dep. at 55).  Shaffer had gone to work for Covenant Transport after completing at least 160 hours of driver training at the Tennessee Truck Driving School and obtaining his CDL. (Shaffer Dep. at 20).  Shaffer left his employment at Covenant Transport while still a trainee driver. (*Id.* at 19).  When he decided to resume commercial driving in 2015, he took a refresher driving course at Peak Technical Institute shortly before being hired by Big M. (*Id.* at 22, 25-26).

In 2013, two years before Shaffer was hired by Big M, his CDL and driver's license were suspended for failure to pay child support. (Shaffer Dep. at 11-12, 16).  In addition, Shaffer's motor vehicle record reflects a citation for following too

---

[2] The Deposition of Benton Elliott is located at Doc. 50-4.

[3] The Deposition of Joshua Shaffer is located at Docs. 46-4 and 46-5.

closely to another vehicle in November 2012, an accident related to the same event, and two occasions when he failed to appear in court in 2010. (*Id.* at 13-15).

Shaffer completed two days of classroom training at Big M after he was hired. (Shaffer Dep. at 28).  As a trainee driver, he was then required to complete an on-the-road training program with a more experienced driver (his trainer). (Elliott Dep. at 72-73).  Big M's on-the-road training program typically lasts six weeks. (*Id.* at 73).  Big M assigned Joshua Spruill to be Shaffer's trainer. (Shaffer Dep. at 28-29).

## B.    The Barrys' First Collision

The subject accident occurred on March 31, 2015.  That day, the Barrys were traveling in their car from Anniston, Alabama, to Fairburn, Georgia, on Interstate 20.  Mr. Barry was driving, and Mrs. Barry was a passenger in the front seat.  Sometime around 6:00 p.m., the weather turned bad.  There was hail, lightning, heavy winds, and heavy rain.  Mr. Barry pulled off on the side of the road.  When the rain and hail lightened up five to ten minutes later, Mr. Barry got back on the highway. (Deposition of David Barry ("D. Barry Dep.") at 21, 25-29).[4]

Shortly after the Barrys resumed travel, they entered a construction zone on I-20. (D. Barry Dep. at 29-30).  The two lanes of travel in the construction zone were shifted to the right—the left lane was blocked off, the right lane was serving

---

[4] The Deposition of David Barry is located at Doc. 46-2.

as the left lane, and the shoulder was serving as the right lane. (Deposition of Judith Taylor ("Taylor Dep.") at 11-12; Deposition of Vanessia Barry ("V. Barry Dep.") at 42; Shaffer Dep. at 98-99).[5]

A few minutes after the Barrys entered the construction zone, they experienced a side-to-side collision with a tractor-trailer. The Barrys were traveling in the right lane of traffic and the tractor trailer was traveling in the left lane.[6] (D. Barry Dep. at 32-33). Mr. Barry testified that the weather was not a factor in the collision and he did not feel it was unsafe to be on the road at that time. (*Id.* at 29-30).

As a result of the collision, the driver's side door of the Barrys' car was caved in, the driver's side mirror was knocked loose, the driver's side window was knocked out, and the front windshield was crushed on the driver's side. (Doc. 50-17 at 3). However, the vehicle was still operational. (D. Barry Dep. at 44). Mr. Barry continued briefly down the interstate and then brought his vehicle to a complete stop in the right lane of traffic (i.e., the shoulder of the road, which was still serving as the right lane), several hundred feet behind a tractor-trailer that was

---

[5] The Deposition of Judith Taylor is located at Doc. 50-3, and the Deposition of Vanessia Taylor is located at Doc. 50-2.

[6] It is disputed who was at fault for the collision. Mrs. Barry testified that the tractor-trailer hit their vehicle. (V. Barry Dep. at 38, 70-71). However, Judith Taylor, who was driving in the right lane behind the Barrys, testified that the Barrys' vehicle veered into the truck. (Taylor Dep. at 14-15).

parked in that lane up ahead. (D. Barry Dep. at 34-36; V. Barry Dep. at 42, 73; Taylor Dep. at 64). He stopped the vehicle with all four wheels within the right lane, close to a guardrail running along the passenger side of the vehicle. (D. Barry Dep. at 36, 44; V. Barry Dep. at 43).

After Mr. Barry stopped in the right lane of traffic, Judith Taylor, who had been driving behind him, brought her vehicle to a stop about four feet behind the Barrys' vehicle. (Taylor Dep. at 16). Danny Moore, who was driving behind Taylor, stopped his vehicle behind Taylor's. (*Id.* at 16-18). All three of the stopped vehicles had their lights on. (*Id.* at 36). The flashing hazard lights of the Barrys' vehicle were also on. (D. Barry Dep. at 45).

After stopping his vehicle, Mr. Barry discovered that he could not get out of the car because the crush from the side-impact collision prevented him from opening his door. (D. Barry Dep. at 38-39; V. Barry Dep. at 41). Mrs. Barry told her husband that she would try to get him out. She then exited the vehicle through her side door. (V. Barry Dep. at 41-43, 79).

## C.     The Subject Accident

That same day, Shaffer and his trainer, Spruill, were also traveling east on Interstate 20, in a Big M tractor-trailer. Shaffer was driving and Spruill was in the sleeper berth. By that time, Shaffer had been training with Spruill for eleven days

and Spruill was comfortable with Shaffer driving without his direct supervision from the front passenger seat.[7] (Shaffer Dep. 147, 168).

When the weather turned bad, Shaffer asked Spruill to get out of the sleeper berth and move into the front passenger seat, which he did. It is unclear exactly when Spruill moved into the passenger seat. Spruill initially testified that he got down from the sleeper berth and into the passenger seat about five minutes before the subject accident. (Spruill Dep. at 23-24). He later testified that he got into the passenger seat earlier, about five to ten minutes before they entered the construction zone where the accident occurred. (*Id.* at 28-29).

Spruill testified that when Shaffer asked him to move into the front passenger seat, it was "raining real hard and hailing." (Spruill Dep. at 23). Shaffer was "nervous" and wanted Spruill in the front seat to "calm him down." (*Id.*) Shaffer asked Spruill if he could pull off the road, but Spruill told him there was no place to pull off and that they just needed to keep on going. (*Id.* at 24). Spruill told Shaffer to stay calm, to keep his distance between the other vehicles on the road, and to keep his speed below the speed limit. (*Id.* at 25).

The Barrys' accident reconstruction expert, Chris Bloomberg, does not agree with Spruill that there was no place for Shaffer to pull off. According to

---

[7] According to Paul Dillard, the Barrys' designated expert on the transportation industry, Spruill's driver logs reflect only two days when Spruill could have been providing any on-duty supervision of Shaffer while Shaffer was operating the tractor-trailer. (Doc. 65-3 at 7).

Bloomberg, there were at least two exits that Shaffer could have taken to exit the highway between the time he told Spruill he was nervous and the time of the accident. (Doc. 65-4 at 4).

How the accident happened is in dispute. Shaffer testified that he was driving between 30-35 miles per hour when he entered the construction zone and continued to drive at that speed after moving into the left lane of traffic. (Shaffer Dep. at 102-04, 164). He said it was still hailing and raining hard. (*Id.* at 94-95). According to Shaffer, another tractor-trailer was traveling in the right lane of traffic and blocked his view of the three vehicles that were stopped in the right lane up ahead (i.e., Danny Moore's vehicle, Judith Taylor's vehicle, and the Barrys' vehicle). (*Id.* at 137-38). The other tractor-trailer suddenly cut into the left lane in front of Shaffer's truck. Shaffer applied his brakes and swerved into the right lane of traffic to avoid hitting the other truck. (*Id.* at 108-09). As he moved into the right lane, Shaffer saw the three vehicles that were stopped in that lane. (*Id.*at 148-50). His tractor-trailer collided with the guardrail and struck the three stopped vehicles. (*Id.* at 79-80, 156-59). Spruill's testimony was similar to Shaffer's, although Spruill testified that the hailing had stopped and the rain had lightened to a drizzle by the time of the accident.[8] (Spruill Depo. at 56).

---

[8] Like Shaffer, Spruill testified at his deposition that Shaffer was driving between 30-35 miles per hour at the time of the accident. (Spruill Dep. at 59, 73). However, there is also evidence that

Judith Taylor testified that the accident happened in a different manner. According to Taylor, the rain had lightened to a light drizzle. (Taylor Dep. at 11). As she was sitting in her stopped vehicle in between the Barrys' vehicle and Danny Moore's vehicle, she saw two tractor-trailers approaching them, both in the right lane of traffic. The leading truck was the Big M truck. The trailing truck came out from behind the Big M truck and moved into the left lane, leaving the Big M truck with nowhere to go but to the right where the three stopped cars were sitting. The Big M truck sideswiped Taylor's and Moore's vehicles along their passenger sides before striking the Barrys' vehicle in the rear. (*Id.* at 22-29).

At the time of the accident, Mrs. Barry was standing in front of the Barrys' vehicle. (V. Barry Dep. at 79-80). She remembers "flying through the air," losing her vision, and then blacking out. (*Id.* at 45). She does not know which of the vehicles involved in the collision struck her. (*Id.*) She was transported from the accident scene by ambulance. (D. Barry Dep. at 67-68).

## D. Post-Accident Events

After the Big M tractor-trailer came to a stop, Shaffer called E911 on his cell phone. (Shafer Dep. at 170). He told the E911 operator: "Two cars collided and then we'[re] coming down the hill and I tried to get 'er downshifted enough and then all the other truckers in front of me slammed on their brakes and I tried to

---

Spruill told the paramedics who transported him from the accident scene that the Big M truck had been traveling at 40-45 miles per hour at the time of the accident. (Doc. 65-5 at 3).

downshift it even harder and ... I pretty much hydroplaned." (Doc. 50-1 at 4). Later in the call he told the operator: "I didn't even see the wreck until the other truck … pulled his trailer out.  He basically saved himself just in time and … he pulled his trailer out and I tried to … swing around him and there was a wreck right here.  I didn't even see it …." (*Id.* at 6).  He also told the operator that Mrs. Barry was "bleeding on the ground" and "barely breathing." (*Id.*)

After talking to E911, Shaffer called Big M's CFO, Wes Davis, and told him what had happened.  Davis told him "to make sure [he took] plenty of pictures of ... the truck, trailer, scene, cars, everything." (Shaffer Dep. at 196).  Shaffer does not recall Davis instructing him to preserve the data on the tractor's electronic data recorder. (*Id.* at 207).

Alabama State Trooper Gary Mitchell investigated the accident along with a trainee trooper, Brandon Maye.  Trooper Maye interviewed the drivers and then prepared the accident report, which Trooper Mitchell approved and signed.  The accident report identified Mr. Barry's "[i]mproper parking/stopped in road" as the primary circumstance contributing to the accident. (Doc. 58-3 at 2, 9).  The report also included a diagram of the accident that showed the Big M tractor-trailer in the right lane of traffic during the entire sequence of events. (*Id.* at 5).

A wrecker truck towed away the Big M truck to Ohatchee, Alabama. (Shaffer Dep. at 197; Elliott Dep. at 231-32). The truck was driven back to Big M's headquarters in Mississippi one or two days later. (Elliott Dep. at 232-33).

Within 24 to 48 hours of the accident, Shaffer was interviewed by Wes Davis and a liability insurance representative at Big M's headquarters in Mississippi. During the interview, Shaffer drew a sketch of the accident. (D.50-16). When Shaffer was deposed a year and a half later, he identified the sketch and confirmed that he had drawn it, but he was unable to recall what all of the markings on the sketch represented. (Shaffer Dep. at 187-95).

On April 27, 2015, just less than a month after the accident, Big M received a "letter of preservation" from counsel for the Barrys, requesting Big M to preserve, among other evidence, the tractor-trailer and the "Electronic Data/Electronic Control Module (ECM) Vehicle Data Recorder/Black Box and its data" (the "ECM data"). (Doc. 64-2; Elliott Dep. at 178-79). By that date, however, the tractor had already undergone accident-related repairs. (Doc. 58-1; Elliott Dep. at 173). In addition, prior to the accident the tractor had been selected for sale to Mack as part of a vehicle swap program. (Doc. 58-1; Elliott Dep. at 174-76). Mack sent Big M a power-of-attorney on April 30, 2015, effectively completing the sale of the tractor, and then took possession of the vehicle. (Doc. 58-1).

Big M did not download or otherwise preserve the tractor's ECM data prior to completing the sale of the tractor to Mack. (Elliott Dep. at 165-66). According to the Barrys' accident reconstruction expert, Chris Bloomberg, the ECM data would likely have provided information "relating to the Big M truck leading up to and at the time of the wreck, including the speed history of the tractor-trailer as it approached [the collision] area, when the brakes were applied, how much the vehicle slowed down, etc." (Doc. 65-4 at 5).

Big M's corporate representative, Benton Elliott, testified that it is Big M's normal practice to "get the ECM data" if they know a collision is severe. (Elliott Depo. at 170). He conceded that there "wasn't anything" preventing Big M from preserving the ECM data in this instance, but said that it "wouldn't have mattered" because it was his understanding from Mack that any accident-related data "would have been gone." (*Id.* at 172-73). He said it was his understanding that "something as simple as moving the truck" can start the process of rewriting the module, so that the accident-related data would have been gone "as soon as the truck probably got to the tow yard." (*Id.* at 166). Contrary to Elliott's understanding, Big M's motor carrier expert, Stephen Chewning, testified that "towing the truck with the engine off would not overwrite [ECM] data" in any truck engine, including a Mack engine. (Deposition of Stephen Chewning ("Chewning Dep.") at 26).[9]

---

[9] The Deposition of Stephen Chewning is located at Doc. 50-8.

**ANALYSIS**

As noted, there are four related motions before the Court. Big M and Shaffer have each moved for summary judgment on the Barrys' claims. (Docs. 46 & 47). The Barrys, in turn, have moved for partial summary judgment on the Defendants' affirmative defenses of contributory negligence, assumption of the risk, and intervening cause, and for imposition of a "spoliation sanction" against the Defendants for their failure to preserve the tractor-trailer's ECM data. (Doc. 50). Shaffer has moved to strike Exhibit 16 to the Barrys' motion, the sketch he drew of the accident. (Doc. 60). The Court will first address Shaffer's motion to strike and the Barrys' spoliation argument. The Court will then consider the parties' summary judgment arguments together.

**A.      Shaffer's Motion to Strike**

In his one-paragraph motion to strike, Shaffer asks the Court to strike Exhibit 16 to the Barrys' motion for partial summary judgment, the sketch he drew of the accident when he was interviewed at Big M's headquarters 24 to 48 hours after the accident occurred. He argues that because he "testified in deposition that he could not recall what various markings on this purported collision [sketch] were," the sketch "does not accurately depict the accident scene and should not be considered" by the Court as evidence. (Doc. 60). That is the extent of his

argument. He cites no rule of evidence or other legal authority in support of his argument.

Shaffer's motion to strike is due to be denied. As the Barrys point out in their opposition to the motion to strike, Shaffer admitted in his deposition that he drew the sketch shortly after the accident occurred for the purpose of describing to Big M's CFO and its insurance carrier how the accident happened. He may not have been able to recall what all of the markings on the sketch depicted, but he did admit that he drew the sketch and was able to testify to what most of the markings represented. (Shaffer Dep. at 181-82, 187-95). Moreover, he never testified that the sketch was inaccurate; he simply was unable to recall what some of the markings on the sketch depicted.

Having been affirmatively identified by Shaffer as the sketch he drew of the accident shortly after it happened, the sketch is certainly evidence relevant to the issues raised in the pending summary motions. Shaffer's motion to strike Exhibit 16 will be denied.

## B.    The Barrys' Request for a Spoliation Sanction

As a part of their motion for partial summary judgment, the Barrys have moved the Court to impose a spoliation sanction against the Defendants for their failure to preserve the tractor's ECM data following the accident. They have moved the Court to either (1) enter a default judgment on the Defendants'

negligence liability or (2) enter an order judicially establishing "the speed [at] which Shaffer was driving and the maneuvers he made in the light most favorable" to the Barrys. (Doc. 51 at 2). In response, the Defendants argue that the "lack of preservation" of the ECM data was "well-reasoned and justifiable" and that, even if the failure to preserve the ECM data is seen as not reasonable, it does not warrant the imposition of sanctions. (Doc. 58 at 1-2). In addition, Shaffer separately argues that there is no evidence that he, as a trainee employee of Big M, had any duty to preserve the tractor's ECM data at the time of the accident or had any custody or control over the tractor following the accident. (Doc. 59 at 1-2).

Spoliation is the "failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Oil Equip. Co. v. Modern Welding Co.*, 661 F. App'x 646, 652 (11th Cir. 2016) (internal quotation marks omitted). The Court has "broad discretion" to impose spoliation sanctions as part of its "inherent power to manage its own affairs and to achieve the orderly and expeditious disposition of cases." *Flury v. Daimler Chrysler*, 427 F.3d 939, 944 (11th Cir. 2005). Sanctions for spoliation of evidence are intended to "prevent unfair prejudice to litigants and to insure the integrity of the discovery process." *Id.*

In diversity cases such as this one, "federal law governs the imposition of sanctions for failure to preserve evidence." *Id.* Rule 37(e) of the Federal Rules of

Civil Procedure, which governs the preservation of electronically stored evidence, provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> **(1)** upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> **(2)** only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
>> **(A)** presume that the lost information was unfavorable to the party;
>>
>> **(B)** instruct the jury that it may or must presume the information was unfavorable to the party; or
>>
>> **(C)** dismiss the action or enter a default judgment.

FED. R. CIV. P. 37(e).

Here, the Court finds that Big M—but not Shaffer—is guilty of spoliation. Big M's corporate representative, Benton Elliott, confirmed that it is Big M's normal practice to retrieve the ECM data from a tractor if they know a collision is severe, and he admitted that there was nothing preventing Big M from preserving the ECM data in this instance. The subject collision was certainly severe; three vehicles were struck by Big M's truck, and Mrs. Barry was rushed from the

accident scene by ambulance.  In addition, Big M received a preservation letter from the Barrys' counsel on April 27, 2015, three days *before* Big M completed the sale of the truck to Mack.  (Doc. 64-2 at 5).  Under these circumstances, Big M's failure to preserve the truck's ECM data amounts to spoliation, as it was reasonably foreseeable, if not a near certainty, that the accident would lead to litigation.

The Court also finds that Big M's failure to preserve the ECM data has prejudiced the Barrys.  The lost ECM data has deprived the Barrys of the best and most accurate evidence of the truck's speed in the moments prior to the collision.

However, Rule 37(e)(2) expressly provides that the severe sanctions of entering a judgment against the spoliating party or presuming that the lost information was unfavorable to the spoliating party—which are, in essence, the sanctions the Barrys have asked the Court to impose here—are limited to situations where the party "acted with the intent to deprive another party of the information's use in the litigation."  FED. R. CIV. P. 37(e)(2).  Moreover, the Advisory Committee Notes to Rule 37(e)(2) caution courts to "exercise caution … in using the measures specified in (e)(2). Finding intent to deprive another of the lost information's use in the litigation does not require a court to adopt any of the measures listed in subdivision (e)(2)." FED. R. CIV. P. 37(e)(2), 2015 Notes of Advisory Committee.

Here, the Court is unwilling to impose either of the severe sanctions requested by the Barrys for a number of reasons. First, the Court is not convinced that Big M acted with the intent to deprive the Barrys of the use of the ECM data in this litigation. Big M has offered a plausible explanation for why it did not preserve the data: it was Big M's understanding that the relevant ECM data would have been overwritten as soon as the truck was moved by the towing company and that the data would have been gone by the time the truck reached the tow yard. Big M's understanding, even if mistaken, is consistent with Big M's insistence that it did not act in bad faith and had no intention of depriving the Barrys of the ability to use the ECM data in litigation. Furthermore, by the time Big M received the preservation letter from the Barrys' counsel, the truck had been driven from the tow yard in Alabama back to Big M's headquarters in Mississippi (further overwriting the ECM data), the accident-related damage to the truck had been repaired, and the sale of the truck to Mack, which had been arranged before the accident, was nearly complete. Under these circumstances, it was not unreasonable for Big M to complete the sale and transfer of the truck to Mack without first endeavoring to have the ECM data downloaded.

Second, although the accident was serious and it was reasonably foreseeable that litigation might ensue, it was Big M's impression that the Barrys were at fault for the accident, as they had stopped their vehicle in a lane of traffic on the

interstate.[10]  While that does not totally absolve Big M from its failure to preserve the truck's ECM data, it does explain why Big M may have concluded that litigation was not likely, at least prior to the time they received the preservation letter from the Barrys' attorneys.

Third, even if the Court were to determine that Big M's real intent was to deprive the Barrys of the use of the ECM data in any ensuing litigation, the Barrys have not been prejudiced to such an extent that the severe sanctions they have requested would be warranted.  In particular, the Barrys have not shown that the loss of the ECM data has impaired their ability to prove their case to such a degree that the only appropriate sanction is to enter a judgment against the Defendants on negligence or to judicially establish the facts in the light most favorable to the Barrys.  Even without the ECM data, the Barrys' accident reconstruction expert, Chris Bloomberg, was able to reconstruct the accident to a sufficient level of certainty to enable him to render an opinion on the speed of the Big M truck prior to impact. (Doc. 65-4; Deposition of Chris Bloomberg ("Bloomberg Dep.") at 98-99, 137).[11]  He testified that the ECM data would have been "another piece of evidence" that would "help validate and support" and "bolster" certain of his opinions (*id.* at 237-38); he did not testify that the ECM data was critical or

---

[10] See the discussion of the Defendants' contributory negligence defense below.

[11] The Deposition of Chris Bloomberg is located at Doc. 50-7.

necessary evidence without which he could not render any meaningful opinions. Indeed, there obviously was sufficient alternative evidence for him to arrive at all of the opinions he has expressed in this case, including his opinion on the speed at which the Big M truck was traveling immediately prior to impact.

Fourth, the Barrys contend that the ECM data is "critical information in helping determine whether Shaffer's driving was negligent or wanton prior to impact." (Doc. 64 at 8). In other words, they contend that the lost data would be helpful in establishing their direct claims against Shaffer (and their respondeat superior claims against Big M) for negligence and wantonness. However, the Barrys have not shown that Shaffer bears any responsibility for the loss of the ECM data. There is no evidence that Shaffer, as a trainee employee of Big M, had any custody or control over the Big M tractor-trailer following the accident. It would be manifestly unjust to enter a default judgment on Shaffer's negligence liability, or to enter an order judicially establishing the speed at which Shaffer was driving and the maneuvers he made prior to impact in the light most favorable to the Barrys, based on Big M's conduct in failing to preserve the ECM data. Such sanctions would unduly prejudice, if not completely foreclose, Shaffer's ability to present his defense to the Barrys' claims.

Alabama state law also supports the imposition of a lesser sanction than the sanctions the Barrys have requested. In analyzing a request for spoliation

sanctions, a court may look to state law for guidance to the extent that state law is consistent with federal law. *See Flury*, 427 F.3d at 944 (examining the spoliation factors enumerated in Georgia law). The Supreme Court of Alabama has applied five factors in analyzing spoliation issues: "(1) the importance of the evidence destroyed; (2) the culpability of the offending party; (3) fundamental fairness; (4) alternative sources of the information obtainable from the evidence destroyed; and (5) the possible effectiveness of other sanctions less severe than dismissal." *Story v. RAJ Properties, Inc.*, 909 So. 2d 797, 802-803 (Ala. 2005). (citation omitted).

Application of these factors supports the Court's determination that the sanctions sought by the Barrys are not warranted. While the ECM data certainly would have been helpful in reconstructing the accident and determining the precise speed at which the Big M tractor-trailer was traveling prior to the collision, the data was not so important that its loss has crippled the Barrys' ability to prove their case against the Defendants. Big M's conduct in failing to preserve the ECM data, while not blameless, does not reflect any malicious intent to deprive the Barrys of the evidence and affect the litigation. *See Vesta Fire Ins. Corp. v. Milam & Co. Constr., Inc.*, 901 So. 2d 84, 95 (Ala. 2004) ("When a party maliciously destroys evidence, that is, with the intent to affect the litigation, that party is more culpable for spoliation."). Requiring the Barrys to proceed on their claims without the ECM data is not fundamentally unfair, as the Barrys have been able, through alternative

sources, to reconstruct the accident and calculate the speed of the Big M truck prior to impact. Conversely, it would be fundamentally unfair to impose the Barrys' requested sanctions on Shaffer, who was not responsible for the loss of the data. Finally, the Court is satisfied that a lesser sanction will be sufficiently effective.

Based on the above, the Barrys' request for spoliation sanctions will be denied to the extent they have asked the Court to enter a default judgment on the Defendants' negligence liability or, alternatively, to enter an order judicially establishing the speed at which Shaffer was driving and the maneuvers he made prior to impact in the light most favorable to the Barrys. However, as an alternative sanction, the Court intends to tell the jury that the ECM data was not preserved and will allow the parties to present evidence and argument at trial regarding Big M's failure to preserve the data.

## C.  The Parties' Summary Judgment Arguments

### 1.  Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of

material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324.   At summary judgment, a court views the evidence in the light most favorable to the non-movant.  *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).  In its review of the evidence, a court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).  At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### 2. Negligent Operation of the Tractor-Trailer

Count II of the Barrys' complaint alleges that Shaffer negligently operated the Big M tractor-trailer. They seek to recover against Shaffer in his individual capacity and against Big M as his employer. The Defendants have moved for summary judgment on the Barrys' negligence claim based on the Barrys' alleged contributory negligence and the "sudden emergency" doctrine. (Doc. 48 at 7-15). The Barrys, in turn, have moved for summary judgment on the Defendants' contributory negligence defense as well as their assumption of risk and intervening cause defenses. (Doc. 19-30). The Court will address these competing summary judgment arguments together.

### a. Sudden Emergency

The Court will first consider the Defendants' "sudden emergency" defense, because it ties into their other defenses. Under the sudden emergency doctrine, "a person faced with a sudden emergency calling for quick action is not held to the same correctness of judgment and action that would apply if he had the time and opportunity to consider fully and choose the best means of escaping peril or preventing injury." *Bettis v. Thornton*, 662 So. 2d 256, 257 (Ala. 1995) (internal quotation mark and citation omitted). For the sudden emergency doctrine to apply, "there must be a sudden emergency and the sudden emergency must not be the fault of the one seeking to invoke the doctrine." *Id.*

The Defendants' sudden emergency argument is premised upon their contention that the accident happened in the manner described by Shaffer and Spruill—namely, that another truck, traveling in the right lane of traffic, blocked Shaffer's view of the stopped cars and that the other truck suddenly cut into the left lane in front of the Big M truck, creating a sudden emergency that forced Shaffer to maneuver the truck into the right lane where the stopped cars were parked. They contend that there is "no admissible evidence" that contradicts this version of how the accident happened. (Doc. 72 at 19). That is not correct. The Defendants ignore the testimony of Judith Taylor, who was sitting in her stopped car behind the Barrys' car and witnessed the accident as it unfolded. According to Taylor, the Big M truck was traveling in the right lane of traffic and a second truck, also traveling in the right lane, came out from behind the Big M truck and moved into the left lane, leaving the Big M driver with nowhere to go but to his right where the stopped cars were sitting. In other words, according to Taylor, the Big M truck was not traveling in the left lane and was not cut off by another truck; rather, the Big M truck was in the right lane the entire time and Shaffer simply failed to notice (for whatever reason) the stopped cars before the other truck moved out from behind him and into the left lane.[12]

---

[12] As noted in the statement of facts above, the accident report included a diagram that showed the Big M tractor-trailer in the right lane of traffic during the entire sequence of events, consistent with Taylor's testimony. (Doc. 58-3 at 5).

There being at least two conflicting versions of how the accident happened, the Defendants are not entitled to a summary judgment on negligence based on the sudden emergency doctrine. It will be for the jury to determine how the accident happened, whether Shaffer was confronted with a sudden emergency, and, if so, who was at fault for creating the sudden emergency.

### b. Contributory Negligence

"Contributory negligence is an affirmative and complete defense to a claim based on negligence. In order to establish contributory negligence, the defendant must show that the plaintiff 1) had knowledge of the dangerous condition; 2) had an appreciation of the danger under the surrounding circumstances; and 3) failed to exercise reasonable care, by placing himself in the way of danger." *Serio v. Merrell, Inc.*, 941 So. 2d 960, 964 (Ala. 2006) (internal quotation marks and citations omitted). Contributory negligence is normally a question for the jury, but contributory negligence "may be found to exist as a matter of law when the evidence is such that reasonable people must all agree that the plaintiff was negligent and that the plaintiff's negligence was a proximate cause of the plaintiff's injury." *Buchanan v. Mitchell*, 741 So. 2d at 1055, 1057 (Ala. 1999).

### i. Mr. Barry's Conduct

The Defendants argue that Mr. Barry was contributorily negligent when he stopped his operational vehicle in a lane of traffic on the interstate. (Doc. 48 at 11).

They argue that the danger of parking an operational vehicle in a lane of traffic on an interstate is "simply self-evident and all reasonable people can logically conclude that [Mr. Barry] would have, or should have, consciously appreciated that danger." (*Id.*)

The Barrys argue just the opposite. They argue that, as a matter of law, Mr. Barry was not negligent in stopping his car where he did, because he was under a statutory duty to comply with ALA. CODE § 32-10-1(a), which provides that "[t]he driver of any motor vehicle involved in an accident resulting in injury to … any person, or in damage to a motor vehicle or other vehicle which is driven or attended by any person, shall immediately stop such vehicle at the scene of such accident or as close thereto as possible …." (Doc. 51 at 24 (emphasis omitted)). They also contend that his decision to stop his car on the interstate "merely created the condition from which the Defendants' intervening acts caused the collision." (*Id.* at 21).

The Court is not convinced by either side's arguments. ALA. CODE § 32-10-1(a) not only provides that a person involved in an accident shall "immediately stop [his] vehicle at the scene of [the] accident or as close thereto as possible," it also provides that "[e]very such stop shall be made without obstructing more traffic than is necessary." Whether Mr. Barry stopped his vehicle as close to the scene of his first accident as possible without obstructing more traffic than was

necessary is an issue of fact for the jury's determination. Given that the shoulder was serving as the right lane of traffic, there was no other emergency lane for Mr. Barry to use, and there was a tractor-trailer parked up ahead in the right lane, the Court cannot say, as a matter of law, that Mr. Barry was negligent in stopping where he did. By the same token, the Court cannot say, as a matter of law, that Mr. Barry was not negligent and acted with reasonable care, given that his car was operational and he stopped his car in a lane of traffic in a construction zone. Ultimately the issue will be for the jury to decide.

The jury will also need to determine whether Mr. Barry's decision to stop his car on the interstate was a proximate cause of the Barrys' injuries. To their credit, the Barrys have candidly admitted that they are unable to point to any Alabama appellate decisions with similar facts as this case. (Doc. 51 at 21). They do cite three cases involving successive collisions from other states[13], but all three cases differ from this case in at least three key respects. First, the issue in each of the cases cited by the Barrys was whether the negligence of a party (or parties) who caused a first collision was a proximate cause of injuries suffered by the accident victims in a second collision, which is not the case here. The cases would be more apt if the Defendants were arguing that the negligence of the driver of the tractor-trailer who (allegedly) side-swiped the Barrys' vehicle was a proximate

---

[13] *Anderson v. Jones*, 213 N.E.2d 627 (Ill. App. Ct. 1966); *Sanders v. Wright*, 642 A.2d 847 (D.C. App. 1994); and *Mahmood v. Pinto*, 974 N.Y.S.2d 102 (N.Y. App. Div. 2005).

cause of the injuries the Barrys suffered when the Big M truck subsequently collided with their stopped car. The Defendants have made no such argument. Second, none of the cases cited by the Barrys involved any contention that the injured parties were contributorily negligent, which is one of the Defendants' primary defenses here. Third, none of the cases involved the sudden emergency doctrine, which the Defendants have also invoked here.

### ii.     Mrs. Barry's Conduct

The Defendants argue that Mrs. Barry was contributorily negligent when she exited the Barrys' parked vehicle and became a pedestrian in a lane of traffic on the interstate. (Doc. 48 at 11). As with Mr. Barry's conduct, they argue that the danger of exciting an operational vehicle parked in a lane of traffic on an interstate is self-evident.

Again, the Barrys argue just the opposite. They argue that the Defendants cannot establish that Mrs. Barry acted with contributory negligence. They offer three related reasons for why Mrs. Barry cannot be found contributorily negligent for exiting the Barrys' vehicle. First, they invoke the sudden emergency doctrine. (Doc. 51 at 30). Second, they argue that "[n]either contributory negligence nor assumption of risk is charged to [h]er who comes to the rescue of others in peril without their fault, unless the act of the rescuer is manifestly rash and reckless to a man of ordinary prudence acting in emergency." (Doc. 51 at 30-31 (quoting

*Seaboard Air v. Johnson*, 115 So. 168, 170 (Ala. 1927)). Third, they argue that a person "should not be charged with contributory negligence, if [s]he is exercising reasonable care so far as things appear to h[er]." (Doc. 51 at 31 (quoting *Dothan v. Hardy*, 188 So. 2d 264, 267 (Ala. 1939)). The crux of the Barrys' argument is that Mrs. Barry was faced with a sudden emergency (her husband was in a stopped car in a lane of traffic on the interstate and could not open his car door), she had a reasonable belief that her husband was in peril, and she acted with reasonable care in attempting to rescue him.[14]

Again, the Court is not swayed by either party's arguments. A reasonable jury could certainly find that Mrs. Barry acted negligently when she exited the Barrys' car and became a pedestrian in a lane of traffic on a busy interstate. The jury could also find that Mr. Barry was not in any immediate peril—he was not injured and could have exited the car through the passenger door just like Mrs. Barry—and that Mrs. Barry was not engaged in a rescue effort. Alternatively, the jury could find that, under the totality of the circumstances, Mrs. Barry did not act negligently and reasonably concluded that she needed to rescue her husband and get him out of the car.

---

[14] The Barrys also argue that Mr. Barry's alleged negligence in stopping his vehicle in a lane of traffic cannot be imputed to Mrs. Barry, who was merely a passenger in the vehicle. The Defendants have not argued that Mr. Barry's alleged negligence should be imputed to Mrs. Barry.

The Barrys also argue that the Defendants cannot establish the element of proximate cause. They argue that the Defendants have produced no evidence that Mrs. Barry's injuries would have been less severe if she had stayed in the car and that "[s]uch is a matter for expert testimony, and [the] Defendants have hired no biomechanical or medical expert to establish such." (Doc. 51 at 32). The Barrys have cited no authority for their contention that the Defendants must have expert testimony to establish a causal relation between Mrs. Barry's conduct and her injuries, and the Court is not convinced that the Defendants' evidence is otherwise insufficient, as a matter of law, to enable the jury to reasonably infer a causal relation between Mrs. Barry's conduct in exiting her vehicle and her resulting injuries.

### c.     Assumption of Risk

The Barrys also seek summary judgment on the Defendants' affirmative defense of assumption of risk. They assert that there is "no evidence of assumption of risk." (Doc. 51 at 32). The Court does not agree. It is undisputed that Mr. Barry parked an operational vehicle in a lane of traffic on an interstate highway. It is undisputed that Mrs. Barry exited the vehicle and became a pedestrian on the interstate. Such evidence is more than sufficient to allow the Defendants to present the defense of assumption of risk to the jury.

### d. Intervening Cause

Lastly, the Barrys seek summary judgment on the Defendants' defense of intervening cause. "An intervening cause must be unforeseeable and must have been sufficient to have been the 'sole cause in fact' of the injury." *Lance, Inc. v. Ramanauskas*, 731 So. 2d 1204, 1210 (Ala. 1999). The Barrys argue that Mr. Barry's conduct—stopping his vehicle on the interstate—was not an intervening cause of his wife's injuries or his own injuries, and that Mrs. Barry's conduct—exiting the vehicle while it was parked on the interstate—was not an intervening cause of her own injuries. (Doc. 51 at 29-30). The Barrys' arguments miss the mark. The Defendants have not argued that either Mr. Barry's conduct or Mrs. Barry's conduct was an intervening cause; as discussed above, they argue that the Barrys' conduct constitutes contributory negligence. To the extent the Defendants have asserted the defense of intervening cause, it relates to their contention that Shaffer was cut off by another tractor-trailer, which forced him to move into the right lane where Mr. Barry had parked his car. (Doc. 59 at 6). This is a disputed matter for the jury's consideration.

### e. Conclusion

Based on the above analysis, the Court concludes that the Defendants are not entitled to summary judgment on the Barrys' negligence claim. Likewise, the Barrys are not entitled to summary judgment on the Defendants' affirmative

defenses of contributory negligence, assumption of risk, and intervening cause. The Barrys may present their negligence claim to the jury, and the Defendants may offer their affirmative defenses to such claim.

### 3. Wantonness

Count I of the Barrys' complaint alleges that Shaffer wantonly operated the Big M tractor-trailer. As with their negligence claim, the Barry's seek to recover against Shaffer in his individual capacity and against Big M as his employer. The Defendants argue that the Barrys' wantonness claim is subject to dismissal because there is no evidence that Shaffer consciously and intentionally engaged in any wrongful conduct. The Barrys respond that, to the contrary, there is substantial evidence of Shaffer's wanton conduct.

The statutory definition of wantonness is "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." ALA. CODE § 6-11-20(b)(3). The Alabama Supreme Court has defined wantonness as "the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result." *Ex parte Essary*, 992 So. 2d 5, 9 (Ala. 2007) (citation omitted). "Wantonness does not require an intent to injure another, but may consist of an inadvertent act or failure to act, when the one acting or failing to act has knowledge that another is probably imperiled by the act or the failure to act

and the act or failure to act is in reckless disregard of the consequences." *Hamme v. CSX Transp., Inc.*, 621 So. 2d 281, 283 (Ala. 1993). Moreover, "[w]antonness is not merely a higher degree of culpability than negligence. Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability." *Tolbert v. Tolbert*, 903 So. 2d 103, 114 (Ala. 2004) (internal citations omitted).

Here, even viewing the evidence in the light most favorable to the Barrys, the evidence is insufficient to support a finding that Shaffer's operation of the Big M truck was wanton. Even assuming that Shaffer was not driving in the left lane of traffic as he and Spruill claim and that he was not faced with the sudden emergency of being cut off by another tractor trailer, his conduct in driving through the construction zone does not reflect a conscious disregard of the rights or safety of others or a consciousness that injury to others would likely or probably result. At most, the evidence reflects that Shaffer was nervous about driving in bad weather, was traveling in the right lane of traffic rather than the left lane, and failed to notice the three stopped cars in the right lane; otherwise, there is no evidence that he was exceeding the speed limit, attempting to pass in the right lane, driving while intoxicated, driving while texting, or engaging in any other risky behavior that he knew was likely to result in injury to others in the construction zone. *See Dawson v. Smith*, 2015 WL 7458635, *3 (Nov. 24, 2015) (granting

summary judgment on the plaintiff's wantonness claims and finding that "[n]o evidence reflects that, at or immediately before the accident, Smith was engaging in risky behavior such as passing on the shoulder, texting, or going faster than the flow of traffic"). Shaffer may have been inattentive in failing to notice the three stopped cars sooner, but inattention or carelessness does not constitute wantonness. *See South Cent. Bell Tel. Co. v. Barnum*, 568 So. 2d 795, 797 (Ala. 1990)

Furthermore, the Supreme Court of Alabama has noted that "[i]in the absence of impaired judgment, such as from the consumption of alcohol, we do not expect an individual to engage in self-destructive behavior." *Essary*, 992 So. 2d at 12. "There is a rebuttable presumption recognized by the law that every person in possession of his normal faculties in a situation known to be dangerous to himself, will give heed to instincts of safety and self-preservation to exercise ordinary care for his own personal protection. It is founded on a law of nature and has [as] its motive the fear of pain or death." *Id.* (quoting *Griffin Lumber Co. v. Harper*, 39 So. 2d 399, 401 (Ala. 1949)). Here, there is no evidence, let alone any substantial evidence, that Shaffer was not in possession of his normal faculties or that his conduct was "so inherently reckless that we might otherwise impute to [him] a depravity consistent with disregard of instincts of safety and self-preservation." *Id.*

### 4. Negligent/Wanton Entrustment

Count III of the Barrys' complaint alleges that Big M negligently or wantonly entrusted the tractor-trailer to Shaffer. Big M argues that the claim fails as a matter of law because there is no evidence that Shaffer had ever manifested any sort of incompetence, much less that Big M was on notice any such incompetence. The Court agrees.

To succeed on their clam for negligent/wanton entrustment, the Barrys must prove the following elements: "(1) an entrustment; (2) to an incompetent; (3) with knowledge that he is incompetent; (4) proximate cause; and (5) damages." *Edwards v. Valentine*, 926 So. 2d 315, 320 (Ala. 2005). Under Alabama law, "the incompetence of a driver is measured by the driver's demonstrated ability (or inability) to properly drive a vehicle." *Halford v. Alamo Rent-A-Car, LLC*, 921 So. 2d 409, 413-14 (Ala. 2005). Such incompetence may be established through evidence that the driver to whom the vehicle was entrusted "was unable or unlikely to have operated the motor vehicle with reasonable safety due to one of several characteristics or conditions, including general incompetence or habitual negligence." *Edwards*, 926 So. 2d at 322 (internal quotation marks and citation omitted). Specifically, proof of a driver's incompetence "may be established by evidence of previous acts of negligent or reckless driving, previous accidents, or previous acts of driving while intoxicated." *Id.* at 322 (internal emphasis and marks

omitted).  Moreover, "[n]egligence is not synonymous with incompetency.  The most competent driver may be negligent." *Pritchett v. ICN Medical Alliance, Inc.*, 938 So. 2d 933, 941 (Ala. 2006) (internal citations omitted).

Here, there is simply no evidence of Shaffer's incompetence as a commercial driver or Big M's knowledge of the same.  It is undisputed that when Shaffer came to work for Big M, he had a valid CDL, he had attended two truck driving schools, and his motor vehicle record reflected a single moving violation and one non-injury accident.  Even the Barrys' transportation industry expert, Paul Dillard, conceded that Shaffer was properly qualified to operate a commercial vehicle according to Federal Motor Vehicle Safety Carrier Regulations. (Deposition of Paul Dillard at 62).[15]

Faced with the absence of any evidence of Shaffer's incompetence as a driver, the Barrys offer two novel theories.  They admit that Shaffer was competent to operate a commercial vehicle generally, but argue that (1) "as an inexperienced trainee he was incompetent to operate a commercial vehicle unsupervised and without proper training" and (2) he became "temporarily incompetent by state of mind to operate the Big M vehicle when he asked his trainer to let him pull the Big M truck off the roadway because, his trainer believed, he was too 'nervous' driving in the stormy weather conditions." (Doc. 65 at 2).

---

[15] The Deposition of Paul Dillard is located at Doc. 46-8.

Not surprisingly, the Barrys have provided no legal authority for their novel theories, which find no support in the law. Lack of experience does not equate to incompetence. Shaffer may have lacked extensive on-the-road commercial driving experience, but that does mean he was incompetent to drive a commercial vehicle on his own. Big M's decision to provide him with additional on-the-road training and supervision during the initial period of his employment in no way suggests that Big M considered him an incompetent driver or that he was one. Likewise, the Court rejects the Barrys' "temporary incompetence" theory. It violates an essential element of negligent entrustment: the employer's knowledge of the employee's incompetence. Incompetence requires knowledge of an employee's "demonstrated" inability to properly drive a vehicle as evidenced by his general incompetence or habitual negligence. There is no such evidence here. Shaffer's expression of nervousness while driving in the bad weather reflects neither general incompetence nor habitual negligence, and the Court is unwilling to elevate a "nervous" state of mind to incompetence.

There being no evidence that Shaffer was an incompetent commercial driver, the Barrys' claim for negligent entrustment fails as a matter of law.

### 5. Negligent/Wanton Training and Supervision

The Barrys' remaining claims against Big M are for negligent training (Count V) and negligent or wanton supervision (Count XI) of Shaffer.[16] These claims fail for the same reasons as their negligent entrustment claim: the Barrys have not shown any evidence that Big M knew or should have known that Shaffer was an incompetent driver.

Alabama law makes little, if any, distinction between claims of wrongful training and wrongful supervision. *Zielke v. AmSouth Bank, N.A.,* 703 So. 2d 354, 357 n.1 (Ala. Civ. App. 1996) ("After reviewing Alabama caselaw, we see no distinction between claims of wrongful supervision and claims of wrongful training."). Like claims for negligent/wanton entrustment, claims for negligent/wanton training and supervision depend on the employee's alleged incompetence and the employer's knowledge of such. "In the master and servant relationship, the master is held responsible *for his servant's incompetency* when notice or knowledge, either actual or presumed, of such unfitness has been brought to him. Liability depends on it being established by affirmative proof that *such incompetency* was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge." *Voyager Ins. Cos. Whitson,* 867 So. 2d 1065, 1073 (Ala.

---

[16] The Barrys have conceded their claims against Big M for negligent hiring (Count One) and for negligent maintenance or repair of the tractor-trailer (Count VII). (Doc. 65 at 1).

2003) (emphasis in original) (internal quotation marks and citation omitted); *see Britt v. USA Truck, Inc.,* 2007 WL 4554027, *4 (M.D. Ala. 2007) ("[T]o prove a claim under Alabama law for either negligent/wanton entrustment, negligent hiring, negligent supervision or negligent retention, a plaintiff must demonstrate that the employer knew, or in the exercise of ordinary care should have known, that its employee was incompetent.").

Here, as discussed above, no evidence in the record suggests that Shaffer was an incompetent driver, much less that Big M knew or should have known of any such incompetence. Accordingly, the Barrys' claims for negligent training and negligent/wanton supervision fail as a matter of law. *See Askew v. R & L Transfer, Inc.,* 676 F. Supp. 2d 1298, 1304 (M.D. Ala. 2009) ("Because … no evidence in the record suggests that [the driver] was incompetent, [the plaintiff's] claim of negligent supervision and training fails.").

## CONCLUSION

Based on the above, the Court concludes as follows:

1.      Shaffer's motion to strike Exhibit 16 to the Barrys' motion for partial summary judgment (doc. 60) is due to be DENIED.

2.      The Barrys' motion for spoliation sanctions (doc. 50) is due to be DENIED to the extent the Barrys have requested the Court to enter a default judgment on the Defendants' negligence liability or, alternatively, to enter an order

judicially establishing the speed at which Shaffer was driving and the maneuvers he made prior to impact in the light most favorable to the Barrys. The Court will, however, inform the jury that the Big M tractor's ECM data was not preserved and will allow the parties to present evidence and argument at trial regarding Big M's failure to preserve the data.

3. The Defendants' motions for summary judgment (docs. 46 & 47) are due to be DENIED as to the Barrys' negligence claim and GRANTED as to the Barrys' claims for wantonness, negligent hiring, negligent maintenance or repair, negligent/wanton entrustment, negligent training, and negligent/wanton supervision.

4. The Barrys' motion for partial summary judgment (doc. 50) on the Defendants' affirmative defenses of contributory negligence, assumption of the risk, and intervening cause is due to be DENIED.

A separate order consistent with this opinion will be entered.

**DATED**, this 11th day of September, 2017.

_____
**JOHN E. OTT**
Chief United States Magistrate Judge